IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FOCUS MUSIC ENTERTAINMENT,
LLC
    *Plaintiff*,

    v.

STREAMIFY, LLC,
    *Defendant*.

Civil Action No. ELH-18-1241

## MEMORANDUM OPINION

Plaintiff Focus Music Entertainment, LLC ("Focus") filed suit against defendant Streamify, LLC ("Streamify"), a music streaming company. ECF 1 (the "Complaint"). Focus alleges, *inter alia*, that Streamify failed to deliver music streaming services pursuant to the terms of a services agreement (the "Agreement"). *Id.* The Complaint contains ten claims: "Breach of Contract" (Count I); "Breach of the Covenant of Good Faith and Fair Dealing" (Count II); "Intentional Breach of Fiduciary Duty" (Count III); "Constructive Fraud" (Count IV); "Fraud" (Count V); "Negligent Misrepresentation" (Count VI); "Professional Negligence" (Count VII); "Negligence" (Count VIII); "Unfair Competition" (Count IX); and "Unjust Enrichment" (Count X).[1] Focus seeks monetary and injunctive relief, in addition to attorneys' fees and costs. *Id.* at 25.

Streamify has filed a "Motion to Dismiss, or in the Alternative, to Stay and to Compel Arbitration," pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(3), and 12(b)(6). ECF 11. It is supported by a memorandum of law (ECF 11-1) (collectively, the "Motion"), and two exhibits. ECF 11-2 - ECF 11-3. Streamify contends that the Agreement's arbitration provision requires arbitration of

---

[1] Jurisdiction is based on diversity of citizenship. *See* 28 U.S.C. § 1332; ECF 1, ¶ 7. Focus refers to each count as a claim for relief. For example, it has a "First Claim for Relief," a "Second Claim for Relief," and so on. I have identified each claim as a "Count."

plaintiff's claims and, therefore, the action is subject to dismissal. ECF 11-1 at 3. It moves to dismiss the Complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1); for improper venue, pursuant to Fed. R. Civ. P. 12(b)(3); and for failure to state a claim, under Fed. R. Civ. P. 12(b)(6). Alternatively, Streamify moves, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, to stay the proceedings pending arbitration. *Id.* at 4.

Focus filed an opposition to the Motion (ECF 12), accompanied by a memorandum of law (ECF 12-1) (collectively, the "Opposition"). It challenges the validity and enforceability of the arbitration provision as unconscionable. Streamify has replied. ECF 13 (the "Reply").

The Motion is fully briefed, and no hearing is necessary to resolve it. *See* Local Rule 105.6. For the reasons that follow, I will deny the Motion and transfer this case to the U.S. District Court for the Southern District of Texas.

## I.     Factual Background

Focus is a Baltimore-based music, entertainment, and technology company that "has several artists who[] make music and seek to distribute [their music] on the internet . . . ." ECF 1, ¶ 11. "Focus gains new listeners . . . through 'organic' downloads and use of various music streaming services (e.g., Spotify, Apple Music and Tidal)." *Id.* ¶ 12. "'Music Streaming' refers to a way of delivering sound – including music – without requiring the listener to download files from the internet." *Id.* ¶ 13.[2]

Streamify is a Texas music streaming agency based in Houston. *Id.* ¶ 6. "'Music Streaming Agencies' are companies that specialize in the digital placement" of songs on streaming services "to increase engagement with their clients' brands, acquire new users for their clients, and related

---

[2] For example, "[w]hen listeners stream a song from Spotify, they can [s]tream play and start listening immediately." ECF 1, ¶ 13. "Thus, listeners do not have to wait for the song to download before the music starts." *Id.*

services." *Id*. ¶ 17. "An agency will contract to increase their client[s'] plays because in turn, that will increase" their clients' popularity, fan base, play count, and royalties. *Id*.

"'Royalties' are typically agreed upon as a percentage of gross or net revenues derived from the use of an asset. The music industry relies on royalties generated by the licensing of copyrighted songs and recordings as a primary form of payment for musicians." *Id*. ¶ 18.

"'Spotify' is the leading music streaming service with over 75 million users" and "over 20 million subscribers" in 58 countries. ECF 1, ¶ 16. It "offers an interactive user experience to paying subscribers" and "a non-interactive user experience to free users . . . ." *Id*. "Interactive Streaming" provides listeners the choice of "which song plays next" and "usually pay[s] higher royalties. *Id*. ¶ 14. Conversely, "Non-interactive Streaming" is a streaming service that picks the next song based on listeners' preferences. *Id*. "Freemium" is the non-interactive streaming model used by Spotify, "where there is no charge to set up an account, but listeners hear ads between sets to help pay the cost to license the songs played." *Id*. ¶ 15. Listeners of Spotify's Freemium service "receive non-interactive playlists based on chosen preferences." *Id*. "However, Spotify desktop [F]reemium users can use the service interactively." *Id*.

Streamify offers the following services to clients, *id*. ¶ 19 (emphasis in original):

> *Streamify delivers plays to your tracks. Ordering plays takes a minute and then you can sit back and Streamify takes care of the rest. Our large partner network can deliver huge amounts of plays in short time. Totally unique users will play your tracks. All plays are absolutely real and eligible for royalties.*

In the summer of 2017, Focus and Streamify entered into the Agreement. *Id*. ¶ 24.[3] Focus claims that it "engaged Streamify to act as its music streaming agency between summer 2017 and

---

[3] Focus states that "true and correct copies" of the Agreement are appended to the Complaint as "Exhibit A," ECF 1, ¶ 24, but no such copies are attached. *See* ECF 1-1 ("Exhibit A"). On May 17, 2018, defense counsel "requested that Plaintiff produce a copy of the Agreement that was supposed to be attached to the Complaint as Exhibit A." ECF 11-1 at 2, n.1.

late 2017 (the 'Streamify Campaign') based on Streamify's representations of its expertise as a music streaming agency and provider of music streaming services." *Id*. ¶ 20 (emphasis omitted). Specifically, "Focus relied on Streamify's expertise to recommend and engage networks and playlists best suited to encourage new listeners to stream its song 'Get to the Money' on Spotify." *Id*. ¶ 22. Focus maintains that it "entered into the Agreement based on Streamify's continued representations that it had the resources available to acquire real music streams, and provide the relevant insight, support, and services required to meet Focus' goal of acquiring new listeners in both existing and new markets." *Id*. ¶ 28.

According to the Complaint, it was "Streamify's role," as Focus's music streaming agency, "to select networks and supervise their conduct in order to cause legitimate music streaming and ultimately acquire royalties for Focus." *Id*. ¶ 23. Through the Streamify Campaign, Focus "wished to gain more listeners & streams, and, ultimately, royalties." *Id*. ¶ 22. And, pursuant to the Agreement, "Streamify promised to perform and deliver services and to provide 'absolutely real' plays." *Id*. ¶ 25.

"During the Streamify Campaign, Streamify purchased inventory on behalf of Focus and its affiliates in a number of jurisdictions." *Id*. ¶ 29. For music streaming in the United States, "Streamify purchased inventory from its networks on an 'agent-principal' basis," *i.e.*, "Streamify purchased inventory on Focus's behalf as Focus' representative in each transaction with networks and playlists." *Id*. ¶ 30. For music streaming outside the United States, "Streamify purchased inventory from networks and playlists on its own principal behalf." *Id*. ¶ 31. For all music streaming, whether on an agent-principal or principal basis, Focus asserts: "Streamify was

---

Plaintiff, through counsel, emailed a copy to defendant on May 22, 2018. As discussed, *infra*, the Agreement (ECF 11-2) and a copy of this email exchange (ECF 11-3) are attached to defendant's Motion.

responsible for the day-to-day oversight of networks and the vetting of playlists for qualify and fraud prevention, in accordance with the Agreement . . . ." *Id.* ¶ 32.

"As part of managing the Streamify Campaign," asserts Focus, "Streamify was supposed to pay networks and playlists for real listeners to stream the song 'Get to the Money.'" *Id.* ¶ 41. To track which network, playlist, or application generated streams of the song, "Streamify and Focus utilized a third-party streaming analytics and performance marketing platform," called Streambeet, Inc. ("Streambeet"). *Id.* ¶ 42. Streambeet's tracking service "collect[s] information about music streaming impressions." *Id.* ¶ 43. Then, Streambeet "awards credit to the playlist, network, or music streaming agency" that generated the streams. *Id.*

To optimize Focus's music streams, "Streamify require[d] networks and playlists participating in the Streamify Campaign to identify all streams running Focus advertisements." *Id.* ¶ 44. Focus asserts: "Streamify was responsible for ensuring that the networks and playlists that it engaged reported accurate and legitimate information to [Streambeet]." *Id.* According to the Complaint, Streambeet "does not believe that it received accurate information from Streamify." *Id.* ¶ 46.

Focus asserts that in late 2017, it "became aware of the pervasive fraud in the Streamify Campaign, when Spotify removed its music from their website." *Id.* ¶ 72. Plaintiff contends that during the Streamify Campaign, "Streamify willfully ignored indicia of fraud in order to keep collecting payments from Focus." *Id.* at 12. In Focus's words, "Streamify sat idly by," as "thousands of Focus' dollars were squandered on nonexistent, nonviewable, and/or fraudulent music streaming." *Id.* ¶ 66.

Further, plaintiff alleges: "Streamify failed to disclose problems with the inventory it purchased because it knew that Focus would have stopped purchases from the implicated networks

and playlists, would have insisted on remediation for fraudulent streaming, and would not have paid." *Id.* ¶ 67. In addition, "Streamify's omissions and misstatements induced Focus to continue its relationship with Streamify" and "to increase spending on music streaming to thousands of dollars." *Id.* ¶ 71.

The Complaint explains: "Paying networks and playlists based on streams is a standard method of compensation in the music streaming industry." *Id.* ¶ 50. However, "in the absence of monitoring by the music streaming agency . . . the model can invite fraud." *Id.* Generally, there are two broad categories of "fraud" in the music streaming industry: "fraudulent installations" and "attribution fraud." *Id.* ¶ 51.

"'Attribution fraud' refers to a scheme where networks or playlists seek credit for organic installations and for installations actually attributable to other media sources. Attribution fraud occurs when networks or playlists insert false information into [Streambeet's] attribution algorithm." *Id.* ¶ 52. Forms of attribution fraud include the following, *id.* ¶ 53:

a. "'Stream Spamming' is where a network or playlist fraudulently generates or reports Streams for users without those Streams actually having occurred. Stream spammers report . . . fake Streams so that when an end user organically installs the streaming service, it will appear as if the installation was attributable to a fraudulently reported stream, thus qualifying for payment. . . ."

b. "'Fake or Malicious Sites' refers to a scheme where a network or playlist reports (and seeks payment for) significant numbers of streaming service installs as attributable to streams made on fake or malicious website URLs. . . ."

c. "'Stacked Ads' or 'Ad-stacking' refers to the schemes where a single inventory placement is filled with several streaming advertisements, even though only one advertisement is visible. When the viewer Streams on a stacked ad, several Streams are sent to [Streambeet], of which only one reflects legitimate user interest in a streaming advertisement. . . ."

(Alteration added).

According to the Complaint, Streamify failed to identify and remedy various forms of fraud in the Streamify Campaign. *Id*. ¶¶ 54, 56-57. According to plaintiff, beginning in the summer of 2017, Streamify "likely provided Focus with fraud [transparency] reports." *Id*. ¶ 59. Plaintiff maintains that "Streamify provided transparency reports to Focus and represented that such reports accurately reflected" Focus's "streaming experience" in the Streamify Campaign. *Id*. ¶ 47. The purpose of the transparency reports was "to facilitate the review of playlist validity and performance and to authenticate legitimate streams, so that Streamify could optimize Focus' music streaming." *Id*. ¶ 60. "Because networks and playlists self-report[ed] data" included in the transparency reports, Focus asserts that it "relied on Streamify to police the quality and accuracy of that data . . . ." *Id*. Based on Streamify's representations in the transparency reports, "Focus' monthly music streaming spending on the Streamify Campaign grew from a couple hundred dollars to thousands of dollars." *Id*. ¶ 49.

In addition, plaintiff alleges: "Streamify allowed networks and playlists to falsify streaming experiences." *Id*. ¶ 66. For example, even "after a playlist was caught" stream spamming, "Streamify would reward the bad actor with additional volume and opportunities to report fake Streams." *Id*. ¶ 75. In addition, Streamify "misused its position as a marketplace leader and as Focus' streaming agency, to solicit improper 'rebate' payments from networks and playlists in exchange for purchasing streaming inventories during the Streamify Campaign and failed to pass such discounts back to Focus." *Id*. ¶ 76.

Moreover, plaintiff contends that Streamify "failed to enforce Focus' prohibition against rebrokering," in which "networks or playlists take advertising offers and re-broker them to third parties to obtain a greater volume of streams." *Id*. ¶ 77. Focus asserts: "Rebrokering is against the terms approved by Focus for use in the Streamify Campaign and also leads to a loss of control

by the music streaming agency over the quality of the streaming and the amount of fraud." *Id.* Furthermore, plaintiff asserts that Streamify "failed to disclose material conflicts of interest to Focus." *Id.* ¶ 78. Because "Streamify purchased inventory during the Streamify Campaign from a third party source," Streamify was "dis-incentivized to police fraud committed by itself." *Id.*

Of the "more than $21,000 [Focus] paid for music streaming managed by Streamify," plaintiff avers, "a material percentage of that amount was used by Streamify to purchase nonexistent, nonviewable, and/or fraudulent inventory from networks and playlists who [sic] Streamify knew or should have known were perpetuating fraud." *Id.* ¶ 79. Focus maintains that had it "known of the extent of fraud in the Streamify Campaign earlier, it would have taken steps to mitigate its harm, including . . . denying approval for Streamify to purchase inventory from networks and playlists perpetuating fraud; obtaining remediation for fraudulent streaming and/or reporting; and/or terminating its relationship with Streamify and the networks and playlists it engaged for the Streamify Campaign." *Id.* ¶ 81.

For the Streamify Campaign, Focus paid $21,000 "up front." *Id.* ¶¶ 34-35. "Beginning in Fall 2017, [Focus] also agreed to pay additional monies to Streamify."[4] *Id.* ¶ 37. In October 2017, "Streamify and Focus concluded business." *Id.* ¶ 38.

Of relevance here, Section 10 of the parties' Agreement, titled "Governing Law and Dispute Resolution," provides, in pertinent part, ECF 11-2:

> This Agreement shall be governed in all respects by the laws of the State of Texas as if this agreement was entered into and to be performed entirely within Texas between Texas residents. Any controversy or claim arising out of or relating to this Agreement, the use of this Website, or otherwise related to the parties' business relationship shall be settled by binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association. Any such controversy or claim shall be arbitrated on an individual basis, and shall not be

---

[4] The Complaint states: "Beginning in Fall 2017, Streamify also agreed to pay additional monies to Streamify." ECF 1, ¶ 37.

consolidated in any arbitration with any claim or controversy or any other party. The arbitration shall be conducted in Houston, Texas, and judgment on the arbitration award may be entered by any court having jurisdiction thereof. . . .

Additional facts are included in the Discussion.

## II.    Legal Standards

### A.    The Federal Arbitration Act

Streamify moves to dismiss.  Alternatively, under the Federal Arbitration Act, Streamify moves to stay proceedings and compel arbitration.

The FAA, which was enacted in 1925, "provides for the enforceability of arbitration agreements and specifies procedures for conducting arbitrations and enforcing arbitration awards . . . ." *McCormick v. Am. Online, Inc.*, ___ F.3d ____, 2018 WL 6204888, at *1 (4th Cir. Nov. 29, 2018).   Under § 2 of the FAA, an arbitration contract is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Thus, "the FAA elevates the arbitration of claims as a favored alternative to litigation when the parties agree in writing to arbitration." *McCormick*, 2018 WL 6204888, at *2 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

In *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500-01 (4th Cir. 2002) (quoting *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991)), the Fourth Circuit explained.

In the Fourth Circuit, a litigant can compel arbitration under the FAA if he can demonstrate "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute."

In *Adkins*, the Court also said, 303 F.3d at 500: "A district court . . . has no choice but to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview."   Accordingly, a court must "engage in a limited review to ensure

that the dispute is arbitrable—*i.e.*, that a valid agreement exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Murray v. United Food and Commercial Workers Int'l Union*, 289 F.3d 297, 302 (4th Cir. 2002).

Nevertheless, there must be an "independent jurisdictional basis" for suit in federal court. *Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 581-82 (2008). Of significance here, "diversity jurisdiction would authorize a federal court to resolve disputes concerning the arbitration process. . . ." *McCormick*, 2018 WL 6204888, at *3.

Section 3 of the FAA is also relevant. It provides, 9 U.S.C. § 3:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

The Fourth Circuit has explained: "The FAA requires a court to stay 'any suit or proceeding' pending arbitration of 'any issue referable to arbitration under an agreement in writing for such arbitration.' This stay-of-litigation provision is mandatory." *Adkins*, 303 F.3d at 500 (quoting 9 U.S.C. § 3)).

Notwithstanding the terms of 9 U.S.C. § 3, some courts have ruled that, in lieu of a stay, "dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable." *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001); *see Willcock v. My Goodness! Games, Inc.*, PWG-16-4020, 2018 WL 3970474, at *4 (D. Md. Aug. 20, 2018); *Kabba v. Ctr.*, PWG-17-211, 2017 WL 1508829, at *2 (D. Md. Apr. 27, 2017) (same), *aff'd*, 730 F. App'x 141 (4th Cir. 2018).

"Whether a party has agreed to arbitrate an issue is a matter of contract interpretation: '[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Levin v. Alms and Assoc., Inc.*, 634 F.3d 260, 266 (4th Cir. 2011) (quoting *Am. Recovery Corp. v. Computerized Thermal Imaging*, 96 F.3d 88, 92 (4th Cir. 1996) (citation omitted)) (alteration in *Levin*).

The FAA reserves for trial the question of whether an arbitration agreement has been made, provided that a question of fact as to that issue is properly generated. *See* 9 U.S.C. § 4.[5] "If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." *Id.* In order to generate an issue for resolution by a factfinder, the party opposing arbitration must make "'an unequivocal denial that the agreement [to arbitrate] had been made,'" and must produce "'some evidence . . . to substantiate the denial.'" *Drews Distributing, Inc. v. Silicon Gaming, Inc.*, 245 F.3d 347, 352 n.3 (4th Cir. 2001) (citations and some internal quotation marks omitted). Moreover, "[a]ny uncertainty regarding the scope of arbitrable issues agreed to by the parties must be resolved in favor of arbitration." *Muriithi v. Shuttle Exp., Inc.*, 712 F.3d 173, 179 (4th Cir. 2013) (citations omitted); *see also Levin*, 634 F.3d at 266 ("The 'heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration.'"); *Adkins*, 303 F.3d at 50.

---

[5] In non-admiralty cases, a party may demand trial by jury as to the issue of the existence *vel non* of an arbitration agreement. *See* 9 U.S.C. § 4. Focus has generally demanded a "trial by jury for causes of action, claims, or issues in this action that are triable as a matter of right to a jury." ECF 1 at 25.

## B.        Rule 12(b)(3)

The Supreme Court has observed that an arbitration clause is "a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974).

In *Sucampo Pharmaceuticals, Inc. v. Astellas Pharm., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 550 (4th Cir. 2006), the Fourth Circuit determined that "a motion to dismiss based on a forum-selection clause," such as an arbitration provision, "should be properly treated under Rule 12(b)(3) as a motion to dismiss on the basis of improper venue." The *Sucampo* Court explained, *id* at 548:

> [T]reating a motion to dismiss on the basis of a forum-selection clause under Rule 12(b)(1) presents practical difficulties that undercut the benefits gained from enforcement of the clauses. For example, the court must raise the issue of subject-matter jurisdiction *sua sponte*, if necessary. *See* Fed. R. Civ. P. 12(h)(3). Thus, in cases involving forum-selection clauses, both district and circuit courts would be under an obligation to confirm that the clause was not applicable before reaching the merits of the action. . . . More importantly a motion to dismiss under Rule 12(b)(1) is non-waivable and may be brought at any time—even on appeal— regardless of whether a litigant raised the issue in an initial pleading. Litigants, therefore, could hold back forum-selection clause objections, until after discovery—or even an adverse verdict.

(Internal and external citations omitted).

Moreover, the Fourth Circuit recognized that "Supreme Court precedent suggests that [Rule] 12(b)(6) is not the appropriate motion for enforcing a forum-selection clause." *Sucampo*, 471 F.3d at 549. It observed that "because a 12(b)(6) motion may be brought at any time prior to adjudication on the merits, analyzing forum-selection clauses under Rule 12(b)(6) would present some of the same timing concerns as in the 12(b)(1) context." *Id.* (citations omitted). The Court reasoned: "Analyzing forum-selection agreements under Rule 12(b)(3) would avoid the doctrinal and timing disadvantages of utilizing Rule 12(b)(1) or (6) and be consistent with Supreme Court

precedent." *Id* (citing *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285 (11th Cir. 1998) (finding that motions to dismiss based on forum-selection clause should be analyzed under Rule 12(b)(3) based on the Supreme Court's decision in *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988))).

Since *Sucampo*, the Fourth Circuit has reiterated that a challenge based on a forum-selection clause, including an arbitration clause, should be addressed by way of a motion to dismiss for improper venue under Rule 12(b)(3). *See Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 365 n.9 (4th Cir. 2012). Nevertheless, other judges of this court have considered motions to dismiss in favor of arbitration under Rule 12(b)(1) and Rule 12(b)(6). *See, e.g., Willcock*, 2018 WL 3970474, *3 (D. Md. Aug. 20, 2018) (collecting cases); *Garrett v. Monterey Fin. Servs., LLC*, JKB-18-325, 2018 WL 3579856, at *2 (D. Md. July 25, 2018) ("[M]otions to dismiss in connection with a valid arbitration agreement are often brought under Rule 12(b)(6) based on the observation that the existence of a valid arbitration clause does not technically deprive the Court of subject matter jurisdiction. . . . However, courts have also found it proper to dismiss claims subject to arbitration agreements under Rule 12(b)(1)." (citations omitted)); *Lomax v. Weinstock, Friedman & Friedman, P.A.*, CCB-13-1442, 2014 WL 176779, at *2 (D. Md. Jan. 15, 2014) ("Courts have found it proper to dismiss claims subject to arbitration agreements under both Rule 12(b)(1) and Rule 12(b)(6)."), *aff'd*, 583 F. App'x 100 (4th Cir. 2014).

In light of the Fourth Circuit's guidance in *Sucampo*, I shall construe defendant's motion to dismiss as one brought under Rule 12(b)(3). *See, e.g., Am. Ins. Mktg. Corp. v. 5 Star Life Ins. Co.*, DKC-13-0560, 958 F. Supp. 2d 609, 612 (D. Md. 2013) (considering a motion to dismiss based on a forum selection clause pursuant to Rule 12(b)(3)); *Enter. Info. Mgmt., Inc. v.*

*SuperLetter.com, Inc.*, DKC-13-2131, 2013 WL 5964563, at *3 (D. Md. Nov. 7, 2013) (considering a motion to dismiss in favor of arbitration pursuant to Rule 12(b)(3)).

A defendant may challenge the sufficiency of plaintiff's choice of venue by way of a motion under Rule 12(b)(3).

In the Fourth Circuit, when a challenge to venue is raised, the plaintiff bears the burden of demonstrating that venue is appropriate. *Bartholomew v. Virginia Chiropractors Ass'n,* 612 F.2d 812, 816 (4th Cir. 1979), *cert. denied*, 446 U.S. 938 (1980), overruled on other grounds by *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119 (1982); *accord Tinoco v. Thesis Painting, Inc.*, GJH-16-752, 2017 WL 52554, at *2 (D. Md. Jan. 3, 2017); *Jones v. Koons Auto. Inc.,* 752 F. Supp. 2d 670, 679 (D. Md. 2010). When the court does not hold an evidentiary hearing, "the plaintiff need only make a prima facie showing that venue is proper." *CareFirst, Inc. v. Taylor*, 235 F. Supp. 3d 724, 732 (D. Md. 2017) (citing *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004)). "In assessing whether there has been a prima facie venue showing, [the court views] the facts in the light most favorable to the plaintiff." *Aggarao*, 675 F.3d at 366. And, the court may "freely consider evidence outside the pleadings . . . ." *Sucampo*, 471 F.3d at 550; *see also Aggarao*, 675 F.3d at 365-56 ("On a motion to dismiss under Rule 12(b)(3), a court is permitted to consider evidence outside the pleadings."); *Taylor v. Shreeji Swami, Inc.*, PWG-16-3787, 2017 WL 1832206, at *1 (D. Md. May 8, 2017) (same); *Convergence Mgmt. Assocs., Inc. v. Callender*, TDC-15-4015, 2016 WL 6662253, at *2 (D. Md. Nov. 10, 2016) (same).

Because "'it is possible for venue to be proper in more than one judicial district,' the question is not whether a given district is the best venue, but whether the events or omissions that occurred there are 'sufficiently substantial.'" *Carefirst*, 235 F. Supp. 3d at 732 (quoting *Mitrano*, 377 F.3d at 405). And, in considering "whether events or omissions are sufficiently substantial to

support venue . . . , a court should not focus only on those matters that are in dispute or that directly led to the filing of the action." *Mirtano*, 377 F.3d at 406 (citation omitted). Instead, "it should review 'the entire sequence of events underlying the claim.'" *Id.*; *accord Taylor*, 2017 WL 1832206, at *1; *Callender*, 2016 WL 6662253, at *2.

### C.      Rule 9(b)

To the extent that the Complaint lodges a claim of fraud, Fed. R. Civ. P. 9(b) is pertinent. It states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

Rule 9(b) serves several salutary purposes:

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (citation omitted).

Claims that sound in fraud, whether rooted in common law or arising under a statute, implicate the heightened pleading standard of Fed. R. Civ. P. 9(b). *See, e.g.*, *E-Shops Corp. v. U.S. Bank N.A.*, 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened pleading requirement also applies to statutory fraud claims."); *see also Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (stating that an MCPA claim that "sounds in fraud[] is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)"). Under the rule, a plaintiff alleging claims that sound in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and

what he obtained thereby.'" *United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.,* 612 F.3d 724, 731 (4th Cir. 2010) (citation omitted). In other words, "'Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Crest Constr. II, Inc. v. Doe,* 660 F.3d 346, 353 (8th Cir. 2011) (citation omitted).

However, by its plain text, Rule 9(b) permits general averment of aspects of fraud that relate to a defendant's state of mind. And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (citation omitted).

### D.    Exhibits

As indicated, a motion to dismiss for improper venue, filed under Rule 12(b)(3), "allows the court to freely consider evidence outside the pleadings . . . ." *Sucampo*, 471 F.3d at 550. "Exhibit A" (ECF 1-1), appended to the Complaint, contains several documents: an email of September 11, 2017, from Streambeet to Chad Focus (*id*. at 1); an email of October 9, 2017, from Chad Focus to Streambeet (*id*.); an email of October 23, 2017, from Chad Focus to Streambeet (*id*. at 2); a copy of Streamify's "Help Guides" (*id*. at 3-7); and a copy of Focus' service orders for the

Streamify Campaign, for the period of June 11, 2017, to September 25, 2017 (*id.* at 8-19). The orders total approximately $21,656. *Id.*

The email of September 11, 2017, includes a forwarded messaged from the "Spotify Compliance Team," notifying Streambeet that Spotify had taken down Chad Focus's song. The forwarded message, which is not dated, states the following, *id.* at 1, 2:

> Dear Streambeet,
>
> Thanks for reaching out to us regarding the tracks of your client (Chad Focus) which you think were wrongfully taken down.
>
> We would like to clarify what happened. Our fraud detection team does that to tracks of mainly non mainstream artists which are getting lots of streams per day (between 3,000 – 10,000 streams per day). We do that in order to verify if the plays are real and eligible.
>
> Upon verifying your artist's track, we found the plays to be real and eligible, as they were all driven organically as verified by the stats. However, the track's latest plays were found to be fake, and these plays were driven in just a few days by a different party which was not Streambeet.
>
> We would like to apologize for taking down the track. Usually when tracks are taken down and are found to be fraudulent, they can't be put up on Spotify again. But this is not the case with your client's track. . . .

In addition, the Complaint mentions that "true and correct copies" of the Agreement are appended to the Complaint as "Exhibit A." ECF 1, ¶ 24. However, Exhibit A includes no such copies. The Agreement (ECF 11-2) and a copy of an email exchange between counsel for the parties concerning the Agreement (ECF 11-3) are attached to defendant's Motion.

### E.    Choice of Law

Jurisdiction is founded on diversity of citizenship. ECF 1, ¶ 7. Under 28 U.S.C. § 1332(a)(1), federal district courts have subject matter jurisdiction over "civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of a State and citizens or subjects of a foreign state . . . ." With exceptions not applicable here, diversity jurisdiction under § 1332 "requires complete diversity among

parties, meaning that the citizenship of every plaintiff must be different from the citizenship of every defendant." *Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011). The "burden of establishing subject matter jurisdiction is on . . . the party asserting jurisdiction." *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010); *accord Hertz Corp. v. Friend*, 559 U.S. 77, 96 (2010).

The Complaint alleges, in relevant part: "Focus is a Maryland company with its principal place of business in Baltimore, Maryland. Defendant Streamify is a Texas company with its principal place of business in Houston, Texas." ECF 1, ¶¶ 5-6.

Under 28 U.S.C. § 1332(c)(1), a corporation is "deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." A corporation's "principal place of business" is "the place where [its] officers direct, control, and coordinate the corporation's activities." *Hertz*, 559 U.S. at 92-93. And, since 1844, a "state of incorporation" has been the state by whose laws the corporation was created. *Id.* at 85 (citation omitted).

However, both parties—Focus Music Entertainment, LLC and Streamify, LLC—are limited liability companies ("LLC"), not corporations. "For purposes of diversity jurisdiction, the citizenship of a limited liability company . . . is determined by the citizenship of all of its members." *Mountain State*, 636 F.3d at 103. With respect to an LLC, citizenship "must be traced through however many layers of partners or members there may be." *Hart v. Terminex Int'l*, 336 F.3d 541, 543 (7th Cir. 2003). In other words, the citizenship of each member must be considered. The Complaint does not reflect any consideration of the place of domicile for members of the LLCs.

Accordingly, by Order of November 16, 2018, I directed plaintiff's counsel to submit a statement addressing the citizenship of the members of Focus and Streamify for diversity purposes.

ECF 14. Focus responded: "In the instant case, Chad Arrington is the sole member of Focus Music Entertainment, LLC. Mr. Arrington is a Maryland citizen. Finding no evidence that any important member of the Defendant, Streamify, LLC is also a Maryland citizen; the Plaintiff's claims are properly addressed in federal court." ECF 15 at 4. Assuming that no member of Streamify is a Maryland citizen, as Focus posits, the Complaint alleges complete diversity of citizenship.

"State contract law governs the question of whether the parties have agreed to arbitrate . . . ." *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 278 (4th Cir. 2007) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).[6]

As noted, Section 10 of the Agreement includes a choice of law provision, providing that Texas law is controlling: "This Agreement shall be governed in all respects by the laws of the State of Texas as if this agreement was entered into and to be performed entirely within Texas between Texas residents." ECF 11-2. In its Opposition, Focus argues that the Court should set aside such provision and interpret the Agreement's arbitration provision under Maryland law. ECF 12-1 at 8.[7] Conversely, Streamify contends that, by operation of the valid choice of law provision, Texas law applies here. ECF 13 at 6.

"[I]nterpretation of private contracts is ordinarily a question of state law." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989); *accord James*

---

[6] As discussed, *infra*, the Agreement contains a choice of law or forum selection provision designating the law of Texas as the applicable law. *See* ECF 11-2 at 5. However, the parties dispute whether the Agreement's arbitration provision should be interpreted under Maryland or Texas law.

[7] In its Opposition, Focus asserts: "[U]nder applicable choice of law principles, Maryland law applies to the Streamify arbitration provision." ECF 12-1 at 8. However, Focus does not apply the appropriate standard under § 187(2) as applied by Maryland courts. Rather, it incorrectly relies on a slightly different three-part inquiry used by California courts. *See Hoffman v. Citibank (South Dakota), N.A.*, 546 F.3d 1078, 1082 (9th Cir. 2008).

*v. Circuit City Stores, Inc.*, 370 F.3d 417, 421-22 (4th Cir. 2004). Because federal courts exercising diversity jurisdiction "apply the choice of law rules of the forum state," I must consult the choice of law rules of Maryland, the state in which this Court is situated, to determine which state's substantive law applies. *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)); *see also Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938)); *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011 ("When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state.").

When a contract contains a choice of law provision, Maryland courts apply § 187(2) of the *Restatement (Second) of Conflict of Laws* (1971) ("Restatement"), which states: "The law of the state chosen by the parties to govern their contractual rights will be applied." *See Ace American Ins. Co. v. Grand Banks Yachts, Ltd.*, 587 F. Supp. 2d 697, 704 (D. Md. 2008) (applying Restatement § 187(2)). Notwithstanding this general rule, Restatement § 187(2) provides for two exceptions:

> (a) The chosen state has no substantial relationship to the parties or transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) The application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Put another way, "[i]n Maryland, choice of law provisions in contracts are enforceable unless the choice of law jurisdiction has no substantial relationship to the transaction, or there is a fundamental policy difference in the laws of another jurisdiction with a more substantial interest

in the parties or the transaction." *United States for use & benefit of Tusco, Inc. v. Clark Constr. Grp.*, 235 F. Supp. 3d 745, 752 n.9 (D. Md. 2016) (citing *Jackson v. Pasadena Receivables, Inc.*, 398 Md. 611, 921 A.2d 799, 803-05 (2011); *Restatement (Second) Conflict of Laws* § 187 (1971)).

As to the first exception, under § 187(2), Focus "concedes that there is a reasonable basis for a Texas choice of law provision," because "Texas is the home state of Defendant Streamify." ECF 12-1 at 8. However, under the second exception, Focus maintains: "Texas law regarding the enforceability of arbitration provisions is contrary to a fundamental policy of Maryland." *Id*. at 9. It contends that, under both Maryland and Texas law, an arbitration provision that is unconscionable is unenforceable. *Id.* But, it claims that in Texas "'arbitration agreements are not inherently procedurally unconscionable even if they might be considered contracts of adhesion.'" *Id.* (citing *Johnson v. AT&T Mobility, LLC*, 09-cv-4104, 2010 WL 5342825 (S.D. Tex. Dec. 21, 2010)). In contrast, Focus contends that in Maryland "contracts of adhesion are 'procedurally unconscionable to at least some degree.'" ECF 12-1 at 9 (citing *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1004 (9th Cir. 2010)).

As Streamify points out, Focus fails to cite a single Maryland case regarding contracts of adhesion that implicates a "fundamental policy" of Maryland law. ECF 13 at 7. Instead, it draws on several decisions, largely within the Ninth Circuit, that apply California law, not Maryland, law.

For example, Focus relies on the Ninth Circuit's decision in *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1004 (9th Cir. 2010), for the proposition that "Maryland law holds that contracts of adhesion are 'procedurally unconscionable at least to some degree.'" ECF 12-1 at 9. However, the full sentence of the *Bridge Fund* excerpt provides: "*California* law treats contracts of adhesion, or at least terms, over which a party of lesser bargaining power had

no opportunity to negotiate, as procedurally unconscionable to at least some degree." *Bridge Fund*, 622 F.3d at 1003 (emphasis added).  A reading of the entire sentence makes abundantly clear that the Ninth Circuit was referring to California law.  Indeed, nowhere in the *Bridge Fund* opinion does the court discuss Maryland law.  Similarly, Focus cites several other cases that make no mention of Maryland law.  *See, e.g., Ulbrich v. Overstock.com, Inc.*, 887 F. Supp. 2d 924, 931 (N.D. Cal. 2012); *Del Rio v. Creditanswers, LLC*, 10-CV-346-WQH-BLM, 2010 WL 3418430 (S.D. Cal. Aug. 26, 2010); *Oestreicher v. Alienware Corp.*, 502 F. Supp. 2d 1061 (N.D. Cal. 2007).

In addition, Focus's contention that Maryland law is controlling directly contradicts its own assertions in the Complaint; the Complaint expressly states: "Focus and Streamify are parties to a Services Agreement, pursuant to which the parties agreed that the laws of the State of *Texas* would govern the Agreement and Amendments thereto, and 'consent[ed] to the exclusive jurisdiction and venue in Houston, Texas.'"  ECF 1, ¶ 8 (emphasis added).  As Streamify highlights, "Nowhere in the Complaint does Plaintiff allege that Maryland law applies to the arbitration provision contained in the Agreement."  ECF 13 at 6.

In any event, the relevant laws of Texas and Maryland do not lead to a different outcome in this case.  "Under Texas law, arbitration agreements are not inherently procedurally unconscionable, even if they might be considered contracts of adhesion."  *Johnson*, 2010 WL 5342825, at *4 (citing *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 301 (5th Cir. 2004) ("In Texas, there is nothing per se unconscionable about arbitration agreements; indeed, parties claiming unconscionability bear the burden of demonstrating it")).  Similarly, under Maryland law, "a contract of adhesion is not void per se."  *Barrie Sch. v. Patch*, 401 Md. 497, 517, 933 A.2d 382, 394 (2007) (citation omitted).

Therefore, it is unnecessary to proceed through a choice of law analysis. *See Cleaning Auth., Inc. v. Neubert*, 739 F. Supp. 2d 807, 820 (D. Md. 2010) (citing *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 750 (D. Md. 2003) ("Choice-of-law analysis becomes necessary . . . only if the relevant laws of the different states lead to different outcomes.")); *see also Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 101 (4th Cir. 2013) (citing *Lowry's Reports*). As explained below, under either Texas law or Maryland law, "the outcome is the same."[8] *Perini/Tompkins*, 738 F.3d at 95. In other words, "the choice is immaterial . . . ." *Lowry's Reports*, 271 F. Supp. 2d at 750.

### III.     Discussion

As noted, in deciding a motion to dismiss or to stay pending arbitration, courts must first "engage in a limited review to ensure that the dispute is arbitrable—*i.e.*, that a valid agreement exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Murray v. United Food and Commercial Workers Int'l Union*, 289 F.3d 297, 302 (4th Cir. 2002); *see also Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 938 (4th Cir. 1999). Because Focus challenges the validity of the Agreement's arbitration provision. I must review the principles of contract formation and contract interpretation.

### A.     Principles of Contract Construction

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Richard A. Lord, 1 *Williston on Contracts* § 1:1, at 2-3 (4th ed. 1990); *accord* Restatement (Second) Contracts § 1, at 5 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896

---

[8] Indeed, despite Streamify's contention that Texas law is applicable pursuant to the Agreement's choice of law provision, it still applies Maryland law in asserting that the arbitration provision is not unconscionable. *See* ECF 13 at 11-16.

A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006). "'A contract is formed when an unrevoked offer made by one person is accepted by another.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's County v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)). Thus, mutual assent is an integral component of every contract. *See, e.g.*, *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

"In determining whether there was an enforceable contract, [courts] began [the] analysis by discussing the essential prerequisite of mutual assent to the formation of a contract . . . ." *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015). *See also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'" (citations omitted)). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

A contract may be oral or written, as well as express or implied. "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing.'" *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cnty. Comm'rs of Caroline Cnty v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000)). Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement. *Forty W. Builders,*

*Inc.*, 178 Md. App. at 377-78, 941 A.2d at 1209-10; *see Canaras v. Lift Truck Services*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974). If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable. *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43, 51 (2002); *see L & L Corp. v. Ammendale*, 248 Md. 380, 385, 236 A.2d 734, 737 (1967); *Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287, 290 (1956) (stating that a "contract may be so vague and uncertain as to price or amount as to be unenforceable").

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017). This includes the determination of whether a contract is ambiguous. *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540, 544 (2003).

"'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted). To determine the parties' intention, courts look first to the written language of the contract. *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("[G]enerally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement."); *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position

of the parties would have meant at the time the agreement was effectuated."), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997).

"Maryland courts interpreting written contracts have long abided by the law of objective contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'" *Urban Growth Prop. Ltd. P'ship v. One W. Balt. St. Assocs. LLC*, No. 882, Sept. Term, 2015, 2017 WL 526559, at *5 (Md. Ct. Spec. App. Feb. 9, 2017) (citation omitted) (unpublished); *see Cochran*, 398 Md. at 16, 919 A.2d at 709; *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014) (internal quotations and alteration omitted). The court's "task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement." *Dumbarton*, 434 Md. at 52, 73 A.3d at 232. Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id.* (quoting *Gen. Motors Acceptance v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)).

As indicated, to determine the parties' intention, courts first look to the written language of the contract. *See Walton*, 391 Md. at 660, 894 A.2d at 594. "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (citations omitted). A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean. *See Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001); *see also, e.g., Scarlett Harbor,* 109 Md.

App. at 291, 674 A.2d at 142 ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed.").

Moreover, a court will not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brensdel v. Winchester Constr. Co.*, 392 Md. 601, 623, 898 A.2d 472, 485 (2006). Indeed, "[i]t is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris v. Woods*, 353 Md. 425, 445, 727 A.2d 358, 368 (1999) (*quoting Canaras v. Lift Truck Servs.*, 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 1443 (Table), 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) ("[A] court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck.").

### B.     Unconscionability

As discussed, Section 10 of the Agreement includes an arbitration provision, which provides, in relevant part: "Any controversy or claim arising out of or relating to this Agreement, the use of this Website, or otherwise related to the parties' business relationship shall be settled by binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association. . . ."   ECF 11-2.

Focus appears to dispute the validity of the arbitration provision. Yet, it asserted in its Complaint that Focus and Streamify are parties "to a *valid* and binding Agreement." ECF 1-1, ¶¶ 83, 91 (emphasis added). In Focus's Opposition, however, Focus attacks the validity and enforceability of the Agreement's arbitration provision as procedurally and substantively unconscionable. ECF 12-1 at 7, 13.

"Maryland contract law on unconscionability contains two components, a procedural and substantive aspect." *Dieng v. College Park Hyundai*, DKC-09-0068, 2009 WL 2096076, at *5 (D. Md. July 9, 2009). "'The prevailing view is that [procedural and substantive unconscionability] must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability.'" *Ratliff v. CoStar Realty Information, Inc.*, DKC-11-0813, 2011 WL 2680585, at *5 (D. Md. 2011) (quoting *Holloman v. Circuit City Stores, Inc.*, 391 Md. 580, 603, 894 A.2d 547, 561 (2006)) (alteration in *Ratliff*).

In *Carlson v. General Motors Corp.*, 883 F.2d 287, 296 n.12 (4th Cir. 1989), the Fourth Circuit distinguished between procedural and substantive unconscionability:

> Substantive unconscionability involves those one-sided terms of a contract from which a party seeks relief (for instance, "I have the right to cut off one of your child's fingers for each day you are in default"), while procedural unconscionability deals with the process of making a contract—"bargaining naughtiness" (for instance, "Just sign here; the small print on the back is only for our standard form"). Each of these branches of unconscionability has common-law cousins; procedural unconscionability looks much like fraud or duress in contract formation, and substantive unconscionability reminds us of contracts or clauses contrary to public policy or illegal.

(quoting J. White & R. Summers, *Uniform Commercial Code* § 403, at 186 (3d ed. 1988) (footnote omitted)).

First, Focus argues that the arbitration provision is procedurally unconscionable "because it is a contract of adhesion that was procured by a party with unequal bargaining power." ECF 12-1 at 13. Focus explains, *id.*: "The Streamify Agreement containing the arbitration provision was a pre-printed[] document which Plaintiff had no power to negotiate. The document was essentially a take-it-or-leave-it proposition." In addition, it asserts that because the arbitration provision is governed by the "AAA [American Arbitration Association] Commercial Arbitration Rules," Streamify was required to include the rules in the provision, *id.*, but the Agreement only references

the "commercial arbitration rules of the American Arbitration Association." ECF 11-2. In support

of these contentions, Focus relies on cases that apply California law. *See, e.g., Pokorny v. Quixtar,*

*Inc.*, 601 F.3d 987, 997 (9th Cir. 2010) (applying California law); *Cisneros v. Am. General Fin.*

*Serv., Inc.*, 11-02869-CRB, 2012 WL 3025913, at *6 (N.D. Cal. July 24, 2012) (same).[9]

Notably, "a contract of adhesion is not void per se." *Barrie Sch.*, 401 Md. at 517, 933 A.2d

at 394 (citing *Walther v. Sovereign Bank*, 386 Md. 412, 430, 872 A.2d 735, 746 (2005)). The

Maryland Court of Special Appeals explained in *Meyer v. State Farm Fire & Cas. Co.*, 85 Md.

App. 83, 89-90, 582 A.2d 275, 278 (1990):

> 'The fact that a contract is one of adhesion does not mean that either it or any of its
> terms are invalid or unenforceable. A court will be sure to look at the contract and
> its terms with some special care. As in most cases, it will refuse to enforce terms
> that it finds unconscionable and will construe ambiguities against the draftsman;
> but it will not simply excise or ignore terms merely because, in the given case, they
> may operate to the perceived detriment of the weaker party.'

*See also Walther*, 386 Md. at 430-31, 872 A.2d at 746.

Furthermore, "it is well established in Maryland[] that '[a]n unconscionable contract

involves extreme unfairness, made evident by (1) one party's lack of meaningful choice, and

(2) contractual terms that unreasonably favor the other party.'" *Ohio Learning Centers, LLC v.*

*Sylvan Learning, Inc.*, RDB-10-1932, 2012 WL 1067668, at *7 (D. Md. Mar. 27, 2012) (quoting

*Barrie*, 410 Md. at 517, 933 A.2d at 394) (alteration in *Ohio Learning Centers*).

I am not persuaded by Focus's arguments. Focus fails to cite to any allegation of fact that

would establish that the arbitration provision was procedurally unconscionable. As Streamify

---

[9] Frequently, issues concerning contracts of adhesion appear in a "David and Goliath" context, where one side has a predominant place in the market and is a large corporation, providing no room for bargaining as to the terms of a contract. Streamify is one of several music streaming agencies, and plaintiff notes in its Complaint that a competitor, Spotify, is the leading music service. ECF 1, ¶ 16. There are no allegations in the Complaint suggesting inequity in bargaining power.

points out, nowhere in Focus's Opposition does it even suggest "that it did not have the opportunity to review Streamify's Terms and Conditions on the Streamify website." ECF 13 at 11. Further, "the arbitration provision is contained in a separate paragraph with the bold-face heading '**Governing Law and Dispute Resolution**.'" *Id.*

As to attaching the applicable AAA rules, Focus does not cite any relevant authority in which a court, applying Maryland or Texas law, has found that the failure to do so is indicative of procedural unconscionability.

For these reasons, I find that arbitration provision is not procedurally unconscionable. Accordingly, there is no need to reach the question of substantive unconscionability. *See Holloman*, 391 Md. at 603, 894 A.2d at 561. Thus, I conclude that the arbitration provision is valid and enforceable.

## C.     Remedy

There is "tension" within the Fourth Circuit regarding whether dismissal or a stay is appropriate when granting a motion to compel arbitration. *Aggaro*, 675 F.3d at 376. Ordinarily, the "'proper course of action when a party seeks to invoke an arbitration clause is to stay the proceedings pending arbitration,'" under Section 3 of the FAA, "'rather than to dismiss outright.'" *Id.* at 376 n.18 (citation omitted). However, Fourth Circuit case law indicates that dismissal, rather than a stay, may be "a proper remedy when *all* of the issues presented in a lawsuit are arbitrable." *Choice Hotels*, 252 F.3d at 709-10 (emphasis added); *see also Aggarao*, 675 F.3d at 376 n.18 (discussing *Choice Hotels* and status of circuit split as to "whether a district court has discretion to dismiss rather than stay an action subject to arbitration").

As Judge Chasnow noted in *Taylor v. Santander Consumer USA, Inc.*, DKC-15-0442, 2015 WL 5178018, at *7 (D. Md. Sept 3, 2015), despite the "disagreement within the Fourth Circuit as

to [whether] dismissal is appropriate, . . . district courts within the Fourth Circuit have continued to find dismissal appropriate." *See, e.g.*, *Willcock*, 2018 WL 3970474, at *5; *Garrett*, 2018 WL 3579856, at *4 ("The FAA requires a district court to stay judicial proceedings involving issues covered by arbitration agreements. Dismissal is also a proper remedy under the circumstances." (citation omitted)); *Bracey v. Lancaster Foods, LLC*, RDB-17-1826, 2018 WL 1570239, at *7 (D. Md. Mar. 30, 2018) ("Having determined that Bracey is bound by the Arbitration Agreement, the appropriate remedy is dismissal of his claims.") (citing *Choice Hotels*)); *Washington v. Lennar Corp.*, TDC-17-0079, 2018 WL 722418, at *3 (D. Md. Feb. 5, 2018) ("While the FAA further requires only that this Court stay the proceedings pending that arbitration, 'dismissal is prober when all of the issues presented in a lawsuit are arbitrable.' *Choice Hotels* . . . . Here, all of Washington's claims against Lennar are within the scope of the parties' arbitration clause. The Court will thus dismiss Washington's claims.").

Here, defendant is entitled to arbitration. And, the parties' Agreement expressly provides for arbitration to occur in Texas.

Although arbitration is appropriate, this Court cannot compel arbitration in Texas, "as Section 4 of the FAA, 9 U.S.C. § 4, 'has been interpreted to mean that a federal district court may *not* compel arbitration outside of its district.'" *Willcock*, 2018 WL 3970474, at *5 (transferring case back to the Western District of Texas, where plaintiff originally filed suit) (quoting *Enter. Info. Mgmt.*, 2013 WL 5964563, at *9) (emphasis in *Willcock*); *Sykes v. CBS Radio, Inc. of Md.*, 11-2178-AW, 2011 WL 5455924, at *5 (D. Md. Nov. 9, 2011) ("The emerging position within the Fourth Circuit is that the Federal Arbitration Act does not permit district courts to compel arbitration in other jurisdictions."); *Indep. Receivables Corp. v. Precision Recovery Analytics, Inc.*, 754 F. Supp. 2d 782, 786 (D. Md. 2010) (transferring case to the Western District of Texas).

Section 1404(a) authorizes transfer "to any other district . . . where [the case] might have been brought" for the sake of "convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404. The "underlying premise" of § 1404(a) is to enable courts to "prevent plaintiffs from abusing their privilege under [28 U.S.C.] § 1391 [for diversity cases] by subjecting defendants to venues that are inconvenient under the terms of § 1404(a)." *In re: Volkswagen of Am., Inc.*, 545 F.3d 304, 313 (5th Cir. 2008). Put another way, § 1404(a) "tempers the effects" of the plaintiff's choice of venue. *Id.* It "reflects an increased desire to have federal civil suits tried in the federal system at the place called for in the particular case by considerations of convenience and justice." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). To that end, its purpose is "to prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense.'" *Id.* (citation omitted); *accord Mamani v. Bustamante*, 547 F. Supp. 2d 465, 469 (D. Md. 2008).

The district court must "weigh in the balance a number of case-specific factors." *Stewart*, 487 U.S. at 29. These include: "(1) the weight accorded to the plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." *Tr. of the Plumbers and Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015); *see also, e.g.*, *Mamani*, 547 F. Supp. 2d at 469; *Cross v. Fleet Reserve Ass'n Pension Plan*, 383 F. Supp. 2d 852, 856 (D. Md. 2005). Other factors include the "local interest in having localized controversies settled at home" and the "appropriateness in having a trial of a diversity case in a forum that is at home with the state law that must govern the action." *Stratagene v. Parsons Behle & Latimer*, 315 F. Supp. 2d 765, 771 (D. Md. 2004).

In *Independent Receivables*, 754 F. Supp. 2d at 786, Judge Williams found enforceable a dispute-resolution clause contained in the parties' agreement and transferred the case, pursuant to

§ 1404(a), to the U.S. District Court for the Western District of Texas. He considered "the interest in keeping the related claims and Parties involved in this case consolidated in a single action before the same court, (2) interpretation of the underlying contract is governed by Texas state law . . . , and (3) all of the Defendants reside in Texas." *Id*.

In this case, I find that similar facts support a transfer of this action to the U.S. District Court for the Southern District of Texas. The Agreement contemplates that "arbitration shall be conducted in Houston, Texas" (ECF 11-2), and Streamify, LLC is based in Houston, Texas. ECF 1, ¶ 6. *See Sykes*, 2011 WL 5455924, at *5 (transferring action to the Southern District of New York where the agreement at issue indicated that any demand for arbitration must be filed in New York and the defendant resided in New York).

Therefore, I will transfer this case to the U.S. District Court for the Southern District of Texas, so that the court there may compel arbitration and dismiss or stay the case. *See Willcock*, 2018 WL 3970474, at *5.

### IV.    Conclusion

For the reasons set forth above, I shall deny Streamify's "Motion to Dismiss, or in the Alternative, to Stay and to Compel Arbitration" (ECF 11). This case shall be transferred to the U.S. District Court for the Southern District of Texas for further proceedings, to include whether to dismiss or stay pending arbitration.

An Order follows.


Date: December 5, 2018                              _____/s/_____
                                                   Ellen L. Hollander
                                                   United States District Judge